```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| Irving Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff | 22-cv-06502 |
| | 22-cv-06512 |
| Plaintiff-Appellee, | 22-cv-07173 |
| -v- | 22-cv-07189 |
| Multi-Strategy Fund Limited, | 22-cv-07195 |
| Banque Syz & Co. SA, | 22-cv-07372 |
| Lloyds TSB Bank PLC, | 22-cv-07788 |
| Banque Cantonale Vaudoise, | (JSR) |
| Bordier & Cie, | |
| Barclays Bank (Suisse) S.A., | OPINION AND ORDER |
| and Delta National Bank and Trust Company, | |
| Defendants-Appellants. | |

JED S. RAKOFF, U.S.D.J.:

In the latest salvo in the decade-plus litigation surrounding the liquidation of Bernard L. Madoff Investment Securities ("Madoff Securities"),[1] several funds and financial institutions move for an interlocutory appeal of the Bankruptcy Court's order denying their

---

[1] All capitalized terms here used refer to the definitions set forth in this order, unless otherwise specified. Also, all internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

motions to dismiss adversary proceedings against them. The funds in question each invested in Fairfield Sentry Limited ("Fairfield"), one of the largest Madoff "feeder funds" that pooled together other investors' money and invested it in Madoff's Ponzi scheme, and which is alleged to have known about Madoff's fraud. Irving H. Picard, the trustee charged with the liquidation of Madoff Securities (the "Trustee"), seeks to demonstrate the avoidability of transfers made by Madoff Securities to Fairfield and then recover subsequent transfers made by Fairfield to its investors. The Trustee has not alleged that any of the Defendants-Appellants now before the Court, all of which were subsequent transferees of Fairfield, knew about Madoff's fraud.

Putting to one side the demanding showing Defendants-Appellants would need to make to show an interlocutory appeal is justified, the actual legal determination of which they seek review is relatively narrow: can they defeat the Trustee's litigation at the outset because, they contend, the initial transfers from Madoff Securities to Fairfield are protected from avoidance by the so-called "securities safe harbor" set out in 11 U.S.C. § 546(e)? Based on the allegations pleaded by the Trustee, the Bankruptcy Court answered that question in the negative at the pleading stage. Notably, that does not mean that the Trustee will necessarily recover from Defendants-Appellants. The Trustee will still have to prove (and not just allege) that the initial transfers to Fairfield fell outside the securities safe harbor and are therefore avoidable, and Defendants-Appellants, as subsequent transferees, will

even then be able to raise a number of defenses to recovery, including
a good faith defense available to them under 11 U.S.C. § 550(b).

On October 31, 2022, the Court, by bottom-line order, the Court
denied Defendants-Appellants' respective motions requesting an
interlocutory appeal. This Opinion and Order explains the Court's
reasoning.

## I.   Procedural history and the role of the securities safe harbor in this litigation

Defendants-Appellants argue that the initial transfers the
Trustee seeks to avoid -- between Madoff Securities and Fairfield --
are not avoidable because they fall under the "securities safe harbor"
set forth in 11 U.S.C. § 546(e). Whether or not transfers from Madoff
Securities to its customers qualify for that safe harbor has already
been the subject of intense dispute in this litigation, and so some
background as to both the Section 546(e) safe harbor and its role in
this litigation is in order.

The Bankruptcy Code authorizes liquidating trustees "to
invalidate a limited category of transfers by the debtor" so as "[t]o
maximize the funds available for, and ensure equity in, the
distribution to creditors in a bankruptcy proceeding. . . ." Merit
Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883, 887-88 (2018);
see generally 11 U.S.C. §§ 544-553. Showing that an initial transfer
is avoidable is a prerequisite to recovery by a trustee of related
subsequent transfers, but even once that showing is made, a trustee
may only recover the proceeds of the avoidable transfer from any

subsequent transferee under certain circumstances and subject to various defenses. See 11 U.S.C. § 550 (defining and limiting the liability of transferees of avoided transfers); Picard v. Citibank, N.A. (In re BLMIS), 12 F. 4th 171, 181 (2d Cir. 2021) ("Avoidance and recovery are related but distinct concepts.").

Even as to the avoidability of the initial transfer, a trustee's power comes subject to various limitations, including the so-called "securities safe harbor" or "Section 546(e) safe harbor." A version of this was first enacted in 1978 in direct response to a decision by a court in this district that allowed a bankruptcy trustee to seek to avoid $12 million in margin payments made by a commodity broker to a clearing association shortly before the broker's bankruptcy, notwithstanding the clearing association's defense that it was "mere 'conduit' for the transmission of the margin payments." Merit Mgmt., 138 S. Ct. at 889-90. To prevent the potential financial disruption that might be caused by this kind of after-the-fact unraveling of multi-party securities transactions, Congress enacted the securities safe harbor and repeatedly expanded it over subsequent decades. Id. It now shields from avoidability any "transfer that is a margin payment . . . or settlement payment . . . made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant or securities clearing agency, or that is a transfer made by or to (or for the benefit of)" the same types of entities. 11 U.S.C. § 546(e); see also Merit Mgmt., 138 S. Ct. at 891; Enron Creditors Recovery Corp. v. Alfa, S.A.B. de

C.V., 651 F.3d 329, 334 (2d Cir. 2011) (explaining that the safe harbor aims to "minimize[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries . . . by prohibiting the avoidance of 'settlement payments' [or other similar payments] made by, to, or on behalf of a number of participants in the financial markets.").

Over 10 years ago in this litigation, this Court decided that "[b]ecause Madoff Securities was a registered stockbrokerage firm, the liabilities of customers . . . are subject to the 'safe harbor' set forth in section 546(e) of the Bankruptcy Code," as Madoff Securities' payments to customers were "settlement payments" made by or to a stockbroker, or, alternately, "transfer[s] made in connection with a securities contract." Picard v. Katz, 462 B.R. 447, 451 (S.D.N.Y. 2011); see also Secs. Inv. Prot. Corp. v. BLMIS ("Greiff"), 476 B.R. 715, 720-21 (S.D.N.Y. 2012). As such, this Court dismissed the Trustee's claims against Madoff Securities clients except those that fell into some exception to the securities safe harbor,[2] and this

_____

[2] Most notably, the Section 546(e) safe harbor does not apply to transfers that can be avoided under "under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e). Section 548(a)(1)(A) permits the trustee to avoid transfers made within two years of the filing of the bankruptcy petition if those transfers were made with the "actual intent to hinder, delay, or defraud any entity to which the debtor was or became" indebted. 11 U.S.C. § 548(a)(1)(A). Of course, because Madoff Securities' investment arm was engaged exclusively in a Ponzi scheme, "it is patent that all of Madoff Securities' transfers during the two-year period were made with actual intent to defraud present and future creditors, i.e., those left holding the bag when the scheme was uncovered." Katz, 462 B.R. at 453. As such, this Court's decisions in Katz and Greiff allowed the Trustee to seek to recover a broad range of transfers made by Madoff Securities

Case 1:22-cv-06502-JSR   Document 15   Filed 11/03/22   Page 6 of 25

decision was affirmed by the Second Circuit. Picard v. Ida Fishman
Revocable Trust (In re BLMIS), 773 F.3d 411 (2d Cir. 2014); Katz, 462
B.R. at 451; Greiff, 476 B.R. at 720-21.

However, while this Court determined that the Section 546(e) safe
harbor applied by its terms to most transfers from Madoff Securities
to its customers, the Court also concluded that it did not apply to
transfers from Madoff Securities to customers that were in on the
fraud. See Secs. Inv. Prot. Corp. v. BLMIS ("Cohmad"), No. 12-mc-115,
2013 WL 1609154, at *3-4 (S.D.N.Y. Apr. 15, 2013). This was because
if investors "knew that Madoff Securities was a Ponzi scheme, then
they must have known that the transfers they received directly or
indirectly from Madoff Securities were not 'settlement payments' . .
. [or] transactions for the 'purchase, sale, or loan of a security,'"
and were therefore not transfers "made in connection with an actual
'securities contract.'" Id. at *3. The Court noted this was not because
Section 546(e) contained any explicit good faith requirement -- it
does not -- but rather because a transfer from Madoff Securities to a
customer with actual knowledge of the fraud would not fall under
Section 546(e)'s express terms, as such a customer would have known

---

in the two years prior to its bankruptcy, although, as explained in
those opinions, because Section 548(c) protects transferees who
received even fraudulent transfers in good faith and in exchange for
value, the Trustee could recover under Section 548(a)(1)(A) only
from the profits but not the principal of good faith investors. Id.

that the transfer was not a settlement payment or made in connection with a securities contract.[3] Id. at *4.

Cohmad's holding in this respect concerned Madoff Securities' "initial transferees." Id. at *5-6. As to the transferees of those transferees (referred to in Cohmad and herein as "subsequent transferees"), the Court further held that the Section 546(e) defense or any other defense to the avoidability of the initial transfer remained available, whether or not the initial transferee had in fact raised it. Id. at *7; see also SIPC v. BLMIS ("550(a) Decision"), 501 B.R. 26, 29 (S.D.N.Y. 2013) (A "subsequent transferee . . . may raise any defenses to avoidance available to the initial transferee, as well as any defenses to recovery it may have."). But the Court never suggested that the substance of the Section 546(e) defense to the

---

[3] This also explains why the Trustee is required to affirmatively allege knowledge by a transferee to defeat application of the Section 546(e) safe harbor in order to overcome a motion to dismiss at the pleading stage. In general, as the Second Circuit has recently made clear, the Trustee, like any plaintiff, must only plausibly allege its prima facie case, with the burden to plead affirmative defenses falling on defendants. Citibank, 12 F. 4th at 199-200. And Section 546(e) is generally considered an affirmative defense as to which defendants "bear the burden of proof." In re Fairfield Sentry Ltd., 596 B.R. 275, 307 (Bankr. S.D.N.Y. 2018) (collecting cases for this proposition). But "a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense if the defense appears on the face of the complaint." Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 158 (2d Cir. 2003). As a result where, as in Cohmad, the Trustee's complaint demonstrated on its face that the Section 546(e) appeared to apply, it also fell to the Trustee to plead additional circumstances demonstrating why the facially applicable defense did not in fact preclude his suit. Cohmad, 2013 WL 1609154, at *4-5.

avoidance of an initial transfer would vary based on the identity of the person asserting it, except in one specific circumstance: "to the extent that an innocent customer transferred funds to a subsequent transferee who had actual knowledge of Madoff Securities' fraud, that subsequent transferee cannot prevail on a motion to dismiss on the basis of Section 546(e)'s safe harbor." Cohmad, 2013 WL 1609154, at *7. This "follow[ed] from the general principle[] [that a] defendant cannot be permitted to in effect launder what he or she knows to be fraudulently transferred funds through a nominal third party and still obtain the protections of Section 546(e)." Id.

Cohmad had one further holding, relating to the protection Section 546(e) provides for "transfer[s] made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract. . . ." 11 U.S.C. § 546(e).[4]

---

[4] The bankruptcy code defines a "securities contract" capaciously to include, among other things, "a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, any interest in a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein (including an interest therein or based on the value thereof), or option on any of the foregoing," as well "a master agreement that provides for an agreement or transaction" related to these categories of securities. 11 U.S.C. § 741(7)(A). The code also defines "financial institution" to include any "Federal reserve bank, or an entity that is a commercial or savings bank," or, "in connection with a securities contract . . . an investment company registered under the Investment Company Act of 1940." Id. § 101(22). It defines "financial participant" to mean, inter alia, "an entity that, at the time it enters into a securities contract. . . has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity. . . ." Id. § 101(23).

This Court reasoned that the language "in connection with a securities contract" was not limited to securities contracts to which the debtor (here, Madoff Securities) was a party. Id. at *9. The lack of any such explicit textual limitation stood "in contrast to other provisions of the Bankruptcy Code. . . . [that] explicitly focus on the intent of the debtor." Id. As such, Section 546(e)'s reference to transfers made by or to financial institutions or financial participants "in connection with a securities contract" could therefore apply to transfers from Madoff Securities that were made "in connection with" contracts to which Madoff Securities was not ever a party. Id.

Of course, because the securities contract in question must still somehow "relate[] to . . . the initial transfer from Madoff Securities," Section 546(e) would only apply where, for instance, "a withdrawal by a Madoff Securities customer [was] caused by that party's payment obligations to a subsequent transferee under a securities contract," but not where "a withdrawal [from Madoff Securities] . . . just happens to be used in relation to a securities contract a few levels removed from that initial transfer." Id. The Court therefore instructed the bankruptcy court to "adjudicate . . . in the first instance consistent with" its opinion such instances where "a defendant claims protection under Section 546(e) under a separate securities contract as a financial participant or financial institution." Id. at *10.

As described above, Defendants-Appellants in these cases are each recipients of transfers from Fairfield, one of Madoff Securities'

largest feeder funds. In a separate proceeding, the Trustee alleged that Fairfield knew about Madoff's fraud, such that it could not avail itself of the Section 546(e) safe harbor under Cohmad because it knew the payments it received from Madoff Securities were neither settlement payments nor payments in connection with a securities contract. Picard v. Fairfield Inv. Fund Ltd., Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021). Although Fairfield could therefore not prevail at the pleading stage on a Section 546(e) defense, Defendants-Appellants -- each subsequent transferees of Fairfield -- moved to dismiss the Trustee's complaints against them, arguing that because the Trustee had failed to allege that they knew about the fraud, they could invoke the Section 546(e) defense to the avoidability of Madoff Securities' initial transfers to Fairfield. Certain Defendants-Appellants (specifically, Lloyds Bank PLC, Bordier & Cie, Barclays Bank Suisse S.A., and Delta National Bank and Trust Company) also argue that Section 546(e) precludes some or all of the Trustee's claims against them because Madoff Securities' transfers to Fairfield were made "in connection with" securities contracts between Fairfield and them. The Bankruptcy Court denied their motions to dismiss, ruling that, on the pleadings, the Section 546(e) defense was not applicable. Defendants-Appellants now seek immediate appeal of that interlocutory ruling.

## II.   Legal Standard

Congress vested district courts with discretion to grant parties leave to appeal interlocutory orders of bankruptcy judges. See 28

U.S.C. § 158(a)(3). In contrast to 28 U.S.C. § 1292(b), which sets forth explicit statutory criteria for district courts to weigh before certifying their own interlocutory orders for immediate appeal, "[n]either the Bankruptcy Code nor the Rules of [Bankruptcy] Procedure provide standards for guiding that discretion." In re LATAM Airlines Grp. S.A., No. 22-cv-2556, 2022 WL 1471125, at *5 (S.D.N.Y. May 10, 2022). However, "[i]n the absence of such standards, the majority of district courts in the Second Circuit have applied the analogous standard for certifying an interlocutory appeal set forth in 28 U.S.C. § 1292(b)." Id. Here, no party has argued that anything other than the § 1292(b) standard governs, and so the Court assumes it does.[5]

---

[5] For the purposes of deciding when the Courts of Appeals may hear appeals from "final" decisions in bankruptcy cases, the Second Circuit has emphasized that "the concept of 'finality' is more flexible in the bankruptcy context than in ordinary civil litigation," and that "[i]mmediate appeal is allowed of orders in bankruptcy matters that finally dispose of discrete disputes within the larger case." In re Flor, 79 F.3d 281, 283 (2d Cir. 1996). This is because "bankruptcy proceedings often continue for long periods of time, and discrete claims are often resolved at various times over the course of the proceedings," meaning that there may be greater reason than in ordinary civil litigation to seek final resolution of discrete legal questions even while other aspects of the litigation are ongoing. In re Prudential Lines, Inc., 59 F.3d 327, 331 (2d Cir. 1995). Given these differences between the bankruptcy context and ordinary civil litigation, coupled with the fact that, unlike 28 § 1292(b), 28 U.S.C. § 158(a)(3) places no explicit constraints on district courts' authority to hear appeals from interlocutory bankruptcy court orders, it is not obvious that district courts should adopt quite as strong a presumption against appeals from interlocutory bankruptcy orders under Section 158(a)(3) as they have against certifying their own interlocutory orders for appeal under Section 1292(b). Cf. Hermès Int'l v. Rothschild, No. 22-cv-384, 2022 WL 16546644, at *1 (S.D.N.Y. Sept. 30, 2022) (stating that, in the § 1292(b) context, "few presumptions are as integral to judicial efficiency in the federal courts as the one against granting interlocutory review."). However, as stated above,

Under § 1292(b), parties seeking interlocutory review must demonstrate, at least, that the non-final order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "Interlocutory appeals are designed to be rare and reserved for exceptional circumstances, lest they disrupt the orderly disposition of lawsuits in their due course." Hermès Int'l v. Rothschild, No. 22-cv-384, 2022 WL 16545644, at *2 (S.D.N.Y. Sept. 30, 2022).

### III. Analysis

Here, Defendants-Appellants contend that a full reversal of the Bankruptcy Judge's order as to the application of the Section 546(e) safe harbor would immediately lead to the full dismissal of up to seventeen adversary proceedings against subsequent transferees of Fairfield, involving claims of over $700 million, and further to the dismissal of up to $1.1 billion worth of claims in 41 other proceedings. See, e.g., Def. Multi-Strategy Fund Ltd. Mot. Appeal at 4, No. 22-cv-06502 (Dkt. 4). Moreover, Defendants-Appellants argue that the precise issues they raise regarding the application of the Section 546(e) safe harbor are pure questions of law.

---

no party has argued for any standard other than the § 1292(b) standard here, and the Court's decision to deny Defendants-Appellants' motions to appeal would stand even if a different standard applied.

But even assuming arguendo that Defendants-Appellants may in
these respects satisfy several of Section 1292(b)'s requirements for
immediate appeal, they do not satisfy the most important requirement:
that there be reasonable grounds for disagreement as to the Bankruptcy
Judge's order.

A.  Whether the trustee must allege a subsequent transferee's
knowledge of the fraud.

Defendants-Appellants' primary argument -- that the Trustee's
failure to allege their knowledge of Madoff Securities' fraud somehow
brought his claims against them within the scope of Section 546(e) --
is easily dispensed with. As Judge Morris put it below: "[b]y its
terms, the [Section 546(e)] safe harbor is a defense to the avoidance
of the _initial_ transfer." See Memorandum Decision Denying Defendant's
Motion to Dismiss at 16, Picard v. Multi-Strategy Ltd., No. 12-01205
(Bankr. S.D.N.Y. June 13, 2022), Dkt. 122 (emphasis in original).
Defendants-Appellants claim they do not dispute this -- that they only
seek to raise a defense to the initial transfer -- but that only
renders their argument more bizarre. Under this theory, the
avoidability of the initial transfer from Madoff Securities to
Fairfield would turn not on any facts specific to that transfer, but
rather on the subjective mental knowledge of whomever Faifield
subsequently passed the money it had received onto. That position
makes little sense and finds no support in Cohmad or Section 546(e).

To the contrary, this Court made clear in Cohmad that subsequent
transferees could raise the _same_ Section 546(e) defense to the

13

avoidance of the initial transfer as could have been raised by the initial transferee. <u>Cohmad</u>, 2013 WL 1609154, at *7. Other decisions of this Court have likewise made that clear. <u>550(a) Decision</u>, 501 B.R. at 29 ("[T]he subsequent transferee in possession of that transfer may raise any defenses to avoidance available to the initial transferee. . . ."). But Defendants-Appellants cite no authority for the counterintuitive proposition that they may assert a defense to the avoidance of the initial transfer that would have been unavailable to the initial transferee. <u>See</u> <u>In re Enron Corp.</u>, 333 B.R. 205, 223-24 (Bankr. S.D.N.Y. 2005) ("There is no basis to find or infer that transferees should enjoy greater rights than the transferor. . . . [U]nless there is clear legislative intent in the Bankruptcy Code itself not to allow the transferees to stand in the shoes of the transferors, the transferees' position does not change by the transfer.").

This is not, of course, to say that Defendants-Appellants' lack of knowledge of Madoff Securities' fraud is irrelevant to these proceedings. If the Trustee succeeds in demonstrating the avoidability of the initial transfer from Madoff Securities to Fairfield, he must then overcome several additional hurdles in order to actually recover against any of the defendants. As to these additional defenses, the subjective knowledge of Fairfield's subsequent transferees becomes relevant, as the Trustee may not recover from any transferee of Fairfield "that [took the transfer] for value. . . [and] in good faith, and without knowledge of the voidability of the transfer avoided." 11

U.S.C. § 550(b)(1).[6] But their lack of knowledge of Madoff's fraud cannot render unavoidable the otherwise avoidable initial transfer from Madoff Securities to Fairfield.

Defendants-Appellants raise two arguments against this straightforward conclusion. First, they note that, in Cohmad, this Court held that a subsequent transferee's knowledge could be relevant to its ability to assert a successful Section 546(e) defense in one circumstance: "to the extent that an innocent customer transferred funds to a subsequent transferee who had actual knowledge of Madoff Securities' fraud, that subsequent transferee cannot prevail on a motion to dismiss on the basis of Section 546(e)'s safe harbor." Cohmad, 2013 WL 1609154, at *7. This "one caveat" from Cohmad served to ensure that "[a] defendant [could not] . . . in effect launder what he or she knows to be fraudulently transferred funds through a nominal third party and still obtain the protections of Section 546(e)." Id. The exception followed straightforwardly from the logic of Cohmad and Section 546(e), because, as a matter of both text and purpose, Section 546(e) could not be read to protect payments received by persons or

---

[6] This Court has previously interpreted the "for value" language as meaning that the Trustee may not recover from good faith transferees the principal of their investments -- as any transfers received up to the amount of an investor's principal were in satisfaction of its value -- although the Trustee may recover fictitious profits. Katz, 462 B.R. at 453-54. Notably, once there have been multiple layers of subsequent transfers -- once there is a subsequent transferee of a subsequent transferee -- the Bankruptcy Code provides for even greater protection, and prohibits recovery of any transfers received in good faith, whether or not they were received for value. 11 U.S.C. § 550(b)(2).

entities who knew they were not "settlement payments" or transfers made in connection with a securities contract. Id. at *3.

Defendants-Appellants propose expanding this "one caveat" beyond any recognizable limit. Under their proposed rule, any otherwise avoidable transfer from Madoff Securities to a knowing participant in the fraud should somehow retroactively be rendered protected based on the subjective knowledge of persons or entities who receive some portion of the transferred funds at some point down the line. That inference finds no support in Cohmad or, more importantly, in Section 546(e)'s text or purpose, and would make a mess out of Congress's carefully tailored scheme that, among other things, already offers subsequent transferees defenses to recovery, including based on their good faith. See 11 U.S.C. § 550(b).

Defendant-Appellants' second argument -- articulated at oral argument, if not explicitly in their briefs -- would treat Cohmad as essentially having announced an equitable exception to Section 546(e) that would allow the avoidance of transfers protected by the transfer's text. Under this theory, Section 546(e) plainly protects from avoidance all the initial transfers here at issue, no matter the knowledge of Fairfield or its subsequent transferees, but Fairfield specifically, along with any subsequent transferees who also is alleged to have known of the fraud, is precluded from asserting this plainly applicable defense due to some (not quite defined) principle of equity or estoppel.

This argument once again misreads Cohmad. Cohmad did not carve out any atextual but equitable exception to an otherwise applicable Section 546(e) defense; rather, it simply concluded that, in circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) did not apply as a matter of its express terms. Id. at *3. This because any transferee who knew the transfers it received from Madoff Securities contained only stolen proceeds also knew those transfers were neither settlement payments or transfers in connection with a security agreement, meaning that Section 546(e) could not apply. Id. And, as explained above, if Section 546(e) did not embrace the initial transfer, the subjective knowledge of a subsequent transferee cannot retroactively render it applicable.

For the reasons described above, the Court concludes there is no fair ground for disagreement as to Defendants-Appellants' primary argument: that the Trustee's failure to allege their knowledge of the fraud is fatal to his claims at the pleading stage.

   B. Whether the transfers from Madoff Securities to Fairfield were made "in connection" with third-party securities contracts between Fairfield and Defendants-Appellants.

Several Defendants-Appellants claim that there is another argument that provides at least fair ground for disagreement, to wit: that Section 546(e) applies and precludes the Trustee's action because Madoff Securities' transfers to Fairfield were made "by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract" by virtue not of Fairfield's contracts with Madoff Securities -- per Cohmad, and

17

as described above, if Fairfield knew that these were not bona fide securities contracts, then Section 546(e) does not apply to them -- but rather by virtue of Fairfield's contracts with Defendants-Appellants. See 11 U.S.C. § 546(e).

This Court discussed this possibility extensively in Cohmad. There, it concluded that the Section 546(e) safe harbor for transfers to, by, or for financial institutions or financial participants made "in connection with a securities contract" did not, by its plain terms, include any requirement that the securities contract in question be between the debtor and its immediate transferee. Cohmad, 2013 WL 1609154, at *9. "Rather, th[is] Court conclude[d] that Section 546(e)'s requirement that a transfer be made 'in connection with a securities contract' means that the transfer must be 'related to' that securities contract." Id.; see also Fishman, 773 F.3d at 422 ("Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided.").

This Court gave as an example of the sort of situation where Section 546(e) might apply to a transfer made "in connection with a securities contract" between third parties not including the debtor "a hypothetical situation in which the Trustee alleges that a withdrawal of funds by an investment fund from its Madoff Securities customer account occurred because an investor in that fund sought redemption of its investment under the terms of its investment contract." Cohmad, 2013 WL 1609154, at *9. Under such circumstances, at least "[a]ssuming that either the investment fund or the investor

qualifies as a financial institution or financial participant," the initial transfer between Madoff Securities and the investment fund (here, Fairfield) might fall under Section 546(e)'s safe harbor because it was made "in connection with" a securities contract between Fairfield and a third party, even though Madoff Securities was not a party to that contract. Id. But while "a withdrawal by a Madoff Securities customer caused by that party's payment obligations to a subsequent transferee under a securities contract could qualify as 'related to' that later transaction under the securities contract . . . a withdrawal that just happens to be used in relation to a securities contract a few levels removed from that initial transfer might not suffice." Id.[7]

Here, several Defendants-Appellants contend that, even if Fairfield's alleged knowledge of Madoff's fraud means that Madoff Securities' transfers to Fairfield do not qualify as settlement payments or as transfers made in connection with a securities contract between Madoff Securities and Fairfield, the Section 546(e) safe harbor nevertheless applies by virtue of their securities contracts with

---

[7] Cohmad did not explicitly address how, if at all, the initial transferee's knowledge of Madoff's fraud affects the availability of a Section 546(e) defense under this theory. However, since the defendants remaining in Cohmad were "primarily those whom the Trustee alleges did not act in 'good faith,'" and because the entire point of this theory relates to the bona fide securities contract between the initial transferee and a subsequent transferee, it is hard to see why the initial transferee's knowledge of Madoff's fraud would render a Section 546(e) defense based on a securities contract between the initial and subsequent transferee unavailable. Cohmad, 2013 WL 1609154, at *3, 9-10.

Fairfield. The Bankruptcy Judge does not appear to have addressed this argument in any of her decisions denying Defendants-Appellants' motions to dismiss (quite possibly because it was not articulated in any clear fashion).

Here, however, where the argument has been raised, the Trustee offers a response, arguing that "[t]he hypothetical question posed in Cohmad of whether a contract between Fairfield and [a] Defendant could serve as the 'securities contract' for purposes of Section 546(e) became academic once the Second Circuit determined in Fishman that the customer agreement between [Madoff Securities] and Sentry did so." Trustee's Opp. to Def. Lloyds TSB Bank PLC's Mot. For Leave to Appeal at 22, Picard v. Lloyds Bank, No. 22-cv-07173 (Dkt. 11).

This is not entirely convincing. In Fishman, the Second Circuit affirmed this Court's determination that, in many of the Trustee's avoidance actions, Section 546(e) applied because Madoff Securities' transfers to its customers qualified as payments made "in connection with" securities contracts between it and them. Fishman, 773 F.3d at 422. That particular theory is not available here under Cohmad, because of Fairfield's alleged knowledge that its contracts with Madoff Securities were not, in fact, securities contracts. Cohmad, 2013 WL 1609154, at *3. But Cohmad's reasoning as to how a securities contract between third parties might offer a basis for the application of the Section 546(e) safe harbor to transfers between Madoff Securities and its customers offered an independent rationale as to how the safe harbor might apply. The fact that Fishman affirmed an alternative

application of the safe harbor based on the securities contracts
between Madoff Securities and its customers does not render this aspect
of Cohmad irrelevant. If anything, Fishman's language and reasoning
supports this holding of Cohmad, as Fishman explicitly stated that
"Section 546(e) sets a low bar for the required relationship between
the securities contract and the transfer sought to be avoided."
Fishman, 773 F.3d at 422. As such, Fishman reinforces, rather than
undermines, this Court's determination in Cohmad that securities
contracts between Madoff Securities' initial transferees and their
clients might provide an independent basis for applying the Section
546(e) safe harbor.

Nevertheless, this Court cannot conclude that the issue justifies
an interlocutory appeal, for at least two related reasons. First, and
most importantly, whether particular transfers from Madoff Securities
to Fairfield were undertaken "in connection with" securities contracts
between Fairfield and clients qualifying as financial institutions or
financial participants in the relevant sense does not turn on a pure
question of controlling law. Assuming that it may appear from the face
of the Trustee's complaints that some Defendants-Appellants meet the
statutory requirements to qualify as "financial institutions" or
"financial participants," the standard this Court laid out in Cohmad
for when transfers made "in connection with" securities contracts not
involving Madoff Securities -- as here relevant, between Fairfield and
Defendants-Appellants -- was fact-intensive. It would be one thing,
for instance, to say that a transfer from Madoff Securities to

Fairfield was made "in connection with" a securities contract between Fairfield and one of Defendants-Appellants if the transfer was immediately precipitated by a specific withdrawal request made by a specific Fairfield client in connection with its securities agreement with Fairfield. But it would be harder to say the initial transfer between Madoff Securities and Fairfield was made "in connection with" a securities agreement between Fairfield and a third party if, for example, that initial transfer came as part of a regularly scheduled distribution from Madoff Securities to Fairfield that occurred irrespective of any specific agreements between Fairfield and its clients, or in the event that Fairfield solicited the transfer without distributions to any specific client in mind, so as to ensure a generally adequate cash pool with which to cover whichever client redemption requests came in.

In other words, these questions regarding the application of the Section 546(e) safe harbor under the theory that Madoff Securities' transfers to Fairfield were made in connection with Fairfield's contracts with Defendants-Appellants do not appear answerable on the pleadings. For instance, while Defendants-Appellants point to specific allegations in the Trustee's complaint against Fairfield suggesting that some of its withdrawals from its Madoff Securities' account were made in connection with specific investors' redemption requests under their agreements with Faifield, those allegations do not pertain to withdrawals by any of the Defendants-Appellants at issue here. Amended Complaint ¶¶ 53, 58, 63, 67, 71, 76, 80, 85, 100, 104, 109, 114, <u>Picard</u>

v. Fairfield Sentry Ltd., Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y. July 20, 2010), Dkt. No. 23. And the Trustee's complaints against the Defendants-Appellants at issue here allege too little about the circumstances of Defendants-Appellants' withdrawals from Fairfield to know whether such withdrawals, even if undertaken in connection with a securities agreement between Fairfield and Defendants-Appellants, were sufficiently related to Fairfield's earlier withdrawals from Madoff Securities to implicate the Section 546(e) safe harbor. See, e.g., Complaint ¶ 6, Picard v. Delta Nat'l Bank and Tr. Co., No. 08-01789, (Bankr. S.D.N.Y. Aug. 25, 2011) ("A portion of the Faifield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Delta Bank . . . .").

"Questions that turn on factual allegations that have not yet been subject to any discovery or summary judgment motion practice but simply have to be taken most favorably to the plaintiff in their current state are better addressed after discovery is complete because, experience shows, reviewing courts with a complete record in hand are able to resolve disputes between litigants in a more accurate and efficacious manner." Hermès, 2022 WL 16545644, at *3. This is especially the case with respect to issues about the application of Section 546(e), which is, after all, an affirmative defense which falls to defendants to plead and prove. See Citibank, 12 F. 4th at 199-200; Fairfield, 596 B.R. at 307.

Second, because, under the standard described above, some but not all of the transfers at issue here may qualify for the Section 546(e) safe harbor, it seems quite clear that an interlocutory appeal would not hasten the termination of this (decade-plus) litigation and would instead cause further delay. Even if the question of whether any particular transfer from Madoff Securities to Fairfield would qualify for the Section 546(e) safe harbor by virtue of Fairfield's securities contract with a third party could be resolved in some instances on the pleadings (which, as described, above, appears impossible as to most or all transfers here at issue), and even if this Court undertook to make these fact-specific determinations as to each transfer in each case, the result might be piecemeal decisions, with some claims dismissed but many claims allowed to go forward. And were this Court to undertake that task, the litigation below would either be placed on hold, or would proceed under a shadow that might frustrate settlement discussions and otherwise complicate the proceedings.

As explained above, Defendants-Appellants may be right that the Section 546(e) safe harbor might apply to some of the transfers from Madoff Securities to Fairfield if those transfers were made "in connection with," meaning they were clearly related to, securities contracts between Fairfield and its financial institution or financial participant clients. Cohmad, 2013 WL 1609154, at *9. The Trustee is therefore wrong to argue that this aspect of Cohmad has been rendered moot, and the Bankruptcy Judge may need, at some point, to address this argument. But it is the Bankruptcy Judge, not this Court, that

should do so in the first instance, with a full factual record before her. As such, it would make no little sense for this Court to intervene at this stage.

Accordingly, for the foregoing reasons, the Court denied each of Defendants-Appellants' motions seeking interlocutory appeal. That decision is hereby reaffirmed, and the Clerk is directed to close each of the above-captioned cases.


SO ORDERED.

New York, NY
November 3, 2022

JED S. RAKOFF, U.S.D.J.